*FILED*

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

*2014 DEC -3 PM 2: 18*

*US DISTRICT COURT*
*MIDDLE DISTRICT OF FLORIDA*
*ORLANDO, FLORIDA*

HRCC, LTD., a British Virgin Islands Corporation,

      Plaintiff,

CASE NO.: 6:14-CV-2004- ORL-40KRS

v.

HARD ROCK CAFE INTERNATIONAL
(USA), INC., a Florida Corporation,
HARD ROCK LIMITED, a Jersey Channel
Islands Corporation, TOM PEREZ,
an individual, HAMISH DODDS, an individual,
and MICHAEL BEACHAM, an individual,

      Defendants.

_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL

    Plaintiff, HRCC, LTD., by and through undersigned counsel, hereby sues Defendants,

HARD ROCK CAFE INTERNATIONAL (USA), INC., HARD ROCK LIMITED, TOM PEREZ,

HAMISH DODDS and MICHAEL BEACHAM, and states as follows:

### THE PARTIES

    1.    Plaintiff HRCC LTD. ("HRCC") is a British Virgin Islands corporation with its

principal place of business in Nassau, The Bahamas.

    2.    Defendant Hard Rock Cafe International (USA), Inc. ("Hard Rock") is a Florida

corporation with its principal place of business located at 6100 Old Park Lane, Orlando, Florida

32835.

    3.    Upon information and belief, Defendant Hard Rock Limited ("HRL") is a Jersey,

Channel Islands corporation with its principal office located at Suite No. 2, Seaton House 17-19,

Seaton Place, St. Helier, Jersey JE2 3QL. HRL is an affiliated entity of Hard Rock.

4.      Defendant Tom Perez ("Perez") is an individual of the age of majority and is believed to reside in Orlando, Florida. Perez is Director of Business Development and Franchise Operations of Hard Rock.

5.      Defendant Hamish Dodds ("Dodds") is an individual of the age of majority and is believed to reside in Orlando, Florida. Dodds is the President and Chief Executive Officer of Hard Rock.

6.      Defendant Michael Beacham ("Beacham") is an individual of the age of majority and is believed to reside in Orlando, Florida. Beacham is the Vice President of Business Development and Franchise Operations of Hard Rock.

## JURISDICTION AND VENUE

7.      This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a) as the parties are of diverse citizenship, and the amount in controversy exceeds Seventy-Five Thousand Dollars ($75,000.00), exclusive of interests and costs.

8.      This Court has personal jurisdiction over Defendants Hard Rock, Dodds, Perez and Beacham as Hard Rock, Dodds, Perez and Beacham are residents of the State of Florida, transacted business with HRCC in the State of Florida, and/or have caused events to occur in the State of Florida giving rise to the request herein.

9.      This Court has personal jurisdiction over Defendant HRL given that it, by and through Hard Rock, transacted business with HRCC in the State of Florida, and/or caused events to occur in the State of Florida giving rise to the request herein.

10.     HRL, by and through Hard Rock's officers and directors, entered into a franchise agreement with HRCC within this District.

11.     Prior to entering into a franchise agreement with HRL, HRCC and its officers

ZARCO EINHORN SALKOWSKI & BRITO
MIAMI TOWER, 100 S.E. 2ND STREET, 27TH FLOOR, MIAMI, FLORIDA 33131 (305) 374-5418 FAX (305) 374-5428

attended numerous meetings with Hard Rock's officers and directors in Orlando, Florida with respect to the possibility of developing a Hard Rock Cafe franchise in the Caribbean.

12.     Although incorporated in Jersey, Channel Islands, HRL has no management staff in Jersey and conducts no business with HRCC in Jersey with respect to the performance of the obligations under the applicable franchise agreement.

13.     Instead, Hard Rock, acting through HRL, controlled and managed the franchise relationship by exercising and enforcing HRL's rights pursuant to the franchise agreement between HRCC and HRL.

14.     For example, all monthly invoices for continuing fees due under the franchise agreement with HRL were sent to HRCC from Hard Rock's headquarters in Orlando, Florida.

15.     Likewise, all payments for continuing fees due under the franchise agreement with HRL were sent by HRCC to Hard Rock's headquarters in Orlando, Florida.

16.     In addition, Hard Rock handles all legal disputes with Hard Rock Cafe franchisees and enforces the terms of franchise agreements on behalf of HRL.

17.     For example, Hard Rock sent termination and default notices from Orlando, Florida to HRCC for alleged violations of the franchise agreement between HRCC and HRL.[1]

18.     HRL, by and through Hard Rock, intentionally directed its business into Florida such that it should reasonably have anticipated, and had fair warning of, being haled into court in the State of Florida. HRL, by and through Hard Rock, has engaged in purposeful activity in the State of Florida and has established the required minimum contacts within the State of Florida such that this Court's exercise of jurisdiction over HRL does not offend traditional notions of fair

---

[1] Indeed, media outlets have reported that the legal disputes involving HRCC and the Hard Rock Cafe franchise in Grand Cayman are not with HRL, but with the "U.S. Parent Company, Hard Rock International." A copy of the news articles are attached hereto as Exhibit A.

ZARCO EINHORN SALKOWSKI & BRITO
MIAMI TOWER, 100 S.E. 2ND STREET, 27TH FLOOR, MIAMI, FLORIDA 33131 (305) 374-5418 FAX (305) 374-5428

play and substantial justice and, therefore, comports with the principles of due process.

19.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) as the tortious and fraudulent conduct engaged in by Defendants occurred within this District. Venue is also proper because the causes of action alleged herein accrued in Orlando, Florida.

20.    All conditions precedent to the institution of this action have been satisfied, discharged, excused, and/or waived.

## FACTUAL BACKGROUND

21.    Hard Rock is an internationally recognized brand with over 175 locations in over 55 countries, including cafes, hotels, casinos, and live music venues. Hard Rock provides the management, administrative and support services to HRCC with respect to the operation of the Hard Rock Cafe restaurant franchises. As part of the Hard Rock Cafe franchise model, Hard Rock and its affiliates grant its franchisees the right to operate a Hard Rock Cafe restaurant and retail establishment that sells food, beverages and Hard Rock merchandise in exchange for payment of continuing royalties.

22.    In and around March, 1999, Keith Doyle, general manager of HRCC, and Kevin Doyle, shareholder and director of HRCC (collectively "Doyles"), traveled from Grand Cayman to Orlando, Florida to meet with various Hard Rock executives to discuss the possibility of developing Hard Rock Cafe franchises in the Caribbean.

23.    From March, 1999 to June, 2000, the Doyles continued to discuss the development of a Hard Rock franchise in Nassau, Bahamas with various officers and directors of Hard Rock, all of which were based out of Orlando, Florida.

24.    As an inducement to enter into the franchise agreement and invest millions of dollars in a Hard Rock Cafe franchise, Hard Rock's Senior Franchisee Development Executive,

Sam Marable ("Marable"), represented to Kevin Doyle ("Doyle") that HRCC would recoup its initial investment costs within three (3) to five (5) years following the opening of a Hard Rock Cafe franchise. Hard Rock also represented to Doyle that HRCC could expect a 15% to 30% return on the annual revenues of the franchise.

25.     Relying on the representations of Marable concerning the expected profitability of a Hard Rock Cafe in Nassau, HRCC entered into a franchise agreement with HRL dated June 29, 2000 whereby HRCC was granted the rights to open and operate a Hard Rock Cafe restaurant and retail operation under the Hard Rock brand in Nassau, The Bahamas ("HRC Nassau") in exchange for payment of royalties to Hard Rock equal to 5% of its gross receipts from sales of all food and beverage items and 10% of its gross receipts from sales of all merchandise and all other items.

26.     In and around December, 2000, HRCC opened a stand-alone retail store for HRC Nassau which focused on the sale of Hard Rock merchandise.

27.     In order to persuade HRCC to develop a Hard Rock Cafe restaurant in Nassau, Hard Rock's Director of Worldwide Franchise Operations, Mike Kneidinger ("Kneidinger"), represented to HRCC that the addition of a Hard Rock Cafe was a "tremendously worthwhile project" that would enhance the profitability of HRC Nassau.

28.     In particular, Kneidinger stated that HRC Nassau could expect to generate $6.5 million to $7 million in sales per year.

29.     As a result of Hard Rock's representations as to the expected financial performance of HRC Nassau, HRCC agreed to move forward with the construction of the Hard Rock Cafe restaurant as an addition to an existing stand-alone retail shop.

30.     Shortly thereafter, HRCC sub-licensed the rights to operate the HRC Nassau restaurant to Marvin Pinder ("Pinder"), a local resident and landlord of the property in which HRC

Nassau was located.

31.     Prior to the opening of the HRC Nassau restaurant, Hard Rock required HRCC to re-acquire the sublicense rights from Pinder to operate the HRC Nassau restaurant.

32.     As a result, HRCC spent an additional $1 million to regain control of HRC Nassau restaurant from Pinder and continue with the construction of the restaurant to ensure compliance with all requisite safety and regulatory standards.

33.     During the operation of the franchised restaurant, HRC Nassau experienced significant losses on food sales.

34.     It became apparent that HRC Nassau did not generate enough revenue per year to recuperate the millions of dollars initially invested in the opening and operation of the HRC Nassau franchise.

35.     Doyle became increasingly concerned that the food element of the business was grossly unprofitable and that the retail sales of merchandise alone could not sustain the reasonable profitability of the franchise or offset the high costs of operating the Hard Rock Cafe restaurant in Nassau.

36.     In an effort to reduce losses on food, HRCC attempted to implement strategies designed to cut the high costs associated with selling certain food items.

37.     For example, HRCC repeatedly requested approval from Hard Rock to remove and/or reduce the serving sizes of certain items from the food menu throughout the course of the franchise relationship.

38.     However, Hard Rock refused to allow HRCC to remove or reduce the serving sizes of certain food items from the Hard Rock Cafe menu.

39.     HRCC also requested, but was denied, a reduction in royalties paid to Hard Rock

ZARCO EINHORN SALKOWSKI & BRITO
MIAMI TOWER, 100 S.E. 2ND STREET, 27TH FLOOR, MIAMI, FLORIDA 33131 (305) 374-5418 FAX (305) 374-5428

for food and beverage items.

40.     Hard Rock, by and through Perez and/or Beacham, insisted that all Hard Rock Cafe franchisees paid the same amount of royalties to Hard Rock, which ultimately proved to be false and misleading.

41.     Contrary to Hard Rock's representations, Hard Rock agreed to reductions in royalties for other Hard Rock Cafe franchisees.

42.     Unbeknownst to HRCC, Defendants Hard Rock, Dodds, Perez and/or Beacham knew or should have known that the Hard Rock Cafe franchise model was flawed and that the development of Cafe restaurants resulted in significant losses to certain franchisees.

43.     Indeed, an internal strategic report prepared for Hard Rock executives in 2006 concerning the financial performance of the Hard Rock Cafe franchise system ("Report") revealed that a decline in retail sales on merchandise "spurs rapid profit decline" because retail sales were "imperative to sustain profitability." The Report also revealed that stand-alone Hard Rock Cafe restaurants also were unprofitable.

44.     Despite the clear findings of the Report, Defendants refused to provide necessary support or guidance to HRCC and continued to represent that profitability for Hard Rock Cafe restaurants was favorable.

45.     In fact, Hard Rock, Dodds, Perez and/or Beacham deliberately concealed and failed to disclose to HRCC that Hard Rock Cafe restaurants were experiencing substantial losses on food sales.

46.     The losses incurred by HRC Nassau were further exacerbated by Hard Rock's refusal to allow HRC Nassau to set its own hours of operation.

47.     From 2005 to 2012, Doyle repeatedly requested that Hard Rock permit HRC

Nassau to close early because the area was unsafe at night and as a result, business was very slow. Indeed, the costs associated with keeping HRC Nassau open at night resulted in annual losses ranging from $350,000 to $400,000.

48.     Hard Rock, Dodds, Perez and/or Beacham ignored Doyle's repeated requests for concessions. Angered at Doyle's persistence, Dodds told HRCC that Hard Rock should shut down HRC Nassau because it was "not worth the hassle" to Dodds.

49.     In an attempt to further stress the importance of closing HRC Nassau at an appropriate hour, Doyle sent to Hard Rock sales reports evidencing the losses incurred by HRC Nassau during night hours, as well as news reports concerning the high incidents of crime in Nassau, including the various murders, burglaries, robberies and other crimes committed during night hours near HRC Nassau.

50.     In fact, the U.S. Embassy and cruise ship staff advised tourists to avoid the area in which HRC Nassau was located.

51.     Nevertheless, Perez and Beacham insisted that the hours of operation for all Hard Rock Cafe restaurants were fixed and non-negotiable, which was false and misleading.

52.     Contrary to Hard Rock's representations, Hard Rock and Dodds permitted its company-owned Hard Rock Cafe restaurants to close at differing hours.

53.     Instead of addressing Doyle's legitimate concerns over the safety of its staff and the resulting decline in profitability of HRC Nassau, Perez told Doyle to "give it a rest" and forced HRC Nassau to remain open at night.

54.     As a result, HRCC had no choice but to incur additional expenses in hiring armed security guards to protect the premises, patrons and staff at night.

55.     In and around October, 2011, Hard Rock introduced a Loyalty Program that

provided rewards to loyal Hard Rock Cafe customers ("Program").

56.     Upon information and belief, Dodds chose to invest millions of dollars in the Loyalty Program on behalf of Hard Rock and expected to recuperate the investment costs of the Program by forcing Hard Rock Cafe franchisees to participate in the Program.

57.     In particular, Dodds put significant pressure on Perez and Beacham to ensure that all Hard Rock Cafe franchisees enrolled in the Program.

58.     At the outset, HRCC refused to enroll in the Loyalty Program because it imposed significant additional fees and resulted in thousands of dollars in annual losses for HRCC. A copy of Doyle's assessment of the Program, which was provided to Hard Rock, is attached hereto as Exhibit B.

59.     At the same time, Hard Rock continued to insist upon the payment of exorbitant royalties knowing that HRCC already incurred substantial losses on food sales as a result of Hard Rock's refusal to provide concessions to HRCC.

60.     To induce participation in the Program, Hard Rock's Director of Operations in the Americas, Alfonso Moreno ("Moreno"), called Doyle and told him that Dodds, Perez and Beacham threatened to discontinue support to HRCC if HRCC continued to refuse to participate in the Program.

61.     Moreno also represented to Doyle that HRCC and Doyle's Hard Rock Cafe in Grand Cayman were the only franchises that had not enrolled in the Program, which was false and misleading.

62.     Dodds, Perez, and Beacham continued to harass and intimidate Doyle in a concerted effort to force HRCC to enroll in the Loyalty Program, despite Doyle's concerns that it would result in additional losses to HRCC.

ZARCO EINHORN SALKOWSKI & BRITO
MIAMI TOWER, 100 S.E. 2ND STREET, 27TH FLOOR, MIAMI, FLORIDA 33131 (305) 374-5418 FAX (305) 374-5428

63.     On one occasion, Perez called Keith Doyle and accused Doyle of calling franchisees to discourage such franchisees from participating in the Program.

64.     Perez further stated that Doyle was "ruffling too many feathers" and that Hard Rock would close Doyle's Hard Rock Cafe franchise in Grand Cayman if HRCC continued to refuse to enroll in the Program.

65.     On or about September 20, 2012, Beacham and Perez flew to the Cayman Islands to meet with the Doyles in a desperate attempt to force HRCC to enroll in the Loyalty Program.

66.     Beacham and Perez threatened termination of the franchise agreement that the Doyles had with HRL for a Hard Rock Cafe in Grand Cayman, even though Hard Rock had no legitimate basis to terminate the franchise agreement for HRCC's failure to participate in a seemingly voluntary program for franchisees. In fact, Beacham stated to the Doyles on multiple occasions that if HRCC signed the agreement to participate in the Program, "all other problems will go away."

67.     It later became apparent that Dodds, Perez and/or Beacham purposefully made HRCC's working conditions intolerable because Dodds, Perez and/or Beacham had no intention to continue in a franchise relationship with HRCC.

68.     Instead, Dodds, Perez and/or Beacham engaged in a pattern of conduct designed to drive HRCC out of business and wrongfully terminate its franchise agreement with HRL.

69.     Fearing that Dodds, Perez and Beacham would carry through with their threats, HRCC ultimately enrolled in the Loyalty Program.

70.     As a result, HRCC paid Hard Rock additional fees associated with the Program on top of the royalties on food sale revenues that HRCC paid to Hard Rock each month.

71.     In and around June, 2013 to December, 2013, Beacham accused Doyle of allegedly

"bad mouthing" Hard Rock to other franchisees and told Doyle that he was "in trouble in Nassau" and that Hard Rock would "go after Nassau." Fueled by his personal dislike for Doyle, Beacham threatened to stop Doyle and his wife from attending a public concert sponsored by Hard Rock. In particular, Beacham told Doyle that he was not welcome at the concert and that Beacham would personally ensure that Doyle and his wife were not allowed to enter the premises because Hard Rock would not allow Doyle to attend the concert and bad mouth Hard Rock to other franchisees.

72.  On or about December 11, 2013, Hard Rock sent a Notice of Default to Doyle based upon HRCC's alleged failure to pay royalties other nominal fees due in July, August and September, 2013 ("December 11, 2013 Notice"). A copy of the December 11, 2013 Notice is attached hereto as Exhibit C.

73.  Because franchisees are given a 60-day grace period in which to submit payment from the date payments were due, a portion of the past due fees were not immediately due.

74.  Interestingly, Hard Rock failed to specify which fees HRCC was required to pay immediately in order to avoid termination of its franchise agreement and cure its default within the time stated.

75.  Although Hard Rock had no legitimate basis to threaten termination of HRCC's franchise agreement with HRL, Hard Rock continued to fabricate reasons to warrant termination under the applicable franchise agreement.

76.  On or about January 6, 2014, Hard Rock sent a Notice of Termination to Doyle, which purported to terminate the franchise agreement between HRCC and HRL based upon HRCC's failure to cure the defaults in the December 11, 2013 ("January 6, 2014 Notice"). A copy of the January 6, 2014 Notice is attached hereto as Exhibit D.

77.  Again, Hard Rock intentionally failed to disclose which fees HRCC was required

ZARCO EINHORN SALKOWSKI & BRITO
MIAMI TOWER, 100 S.E. 2ND STREET, 27TH FLOOR, MIAMI, FLORIDA 33131 (305) 374-5418 FAX (305) 374-5428

to pay to avoid termination of the franchise agreement.

78.    Shortly after, Dodds and Beacham met with the Doyles in Orlando to discuss the possibility of HRCC regaining the rights to operate HRC Nassau.

79.    Hard Rock agreed to provide concessions to HRCC provided that the Doyles agree to certain concessions relating to the Grand Cayman franchise that Doyle operated.

80.    HRCC refused to succumb to Hard Rock's scare tactics and advised Hard Rock that it could not agree to the requested concessions.

81.    Shortly thereafter, Paul Gomez ("Gomez") was appointed to handle the liquidation of HRC Nassau.

82.    HRC Nassau was later given to Pinder and operated by a company owned by Perez' long-time friend, Paul Zar ("Zar"), and his partner, Anders Vestergaard. Pinder was appointed by Hard Rock as franchisee of HRC Nassau despite the fact that Hard Rock had previously forced HRCC to remove Pinder as a sub-licensee of HRC Nassau while HRC Nassau was under construction.

83.    By April, 2014, Hard Rock, Dodds, Beacham and/or Perez arranged to have HRCC's retail inventory supplies shipped directly to Zar, despite the fact that such inventory supplies belonged to HRCC and/or Gomez. Indeed, HRCC placed the order for such retail supplies from its supplier prior to termination of the franchise agreement. Upon information and belief, Perez conspired with Zar to sell HRCC's assets in order to benefit Zar.

84.    As soon as the new franchisees and store operators began operating HRC Nassau, Hard Rock permitted the HRC Nassau restaurant facility to change its hours of operation such that the location was permitted to close early.

85.    Defendants, through the specific participation and assistance of Perez, Dodds and

12

Beacham, have conspired and engaged in a concerted plan and scheme to drive HRCC out of business and seize HRC Nassau through churning[2] and other unfair and deceptive practices.

86.     Indeed, HRCC has invested nearly $4 million into the restaurant franchises and has paid approximately $5 million in royalties to Hard Rock.

87.     Unbeknownst to HRCC, Hard Rock knew that food sales alone were unprofitable and could not sustain the profitability of the Hard Rock Cafe restaurant franchises.

88.     Yet, Hard Rock failed to provide necessary concessions to HRCC and continued to insist on the payment of exorbitant royalties thereby preventing HRCC from realizing returns that could have easily been achieved with the help and assistance of Hard Rock, Dodds, Perez and/or Beacham.

89.     Upon information and belief, Hard Rock, Dodds, Perez and Beacham's false and misleading conduct was fueled, in part, by Dodds and/or Beacham's personal dislike for Doyle.

90.     Dodds and/or Beacham was angered by Doyle's resistance to Hard Rock's Programs and Doyle's refusal to acquiesce to the demands of Hard Rock, Dodds, Perez and/or Beacham.

91.     In fact, Dodds repeatedly stated that the restaurant franchises operated by Doyle should be shut down.

92.     Beacham stated that he wanted to get rid of Doyle because Doyle was "a cancer in the system."

93.     Although Hard Rock provided similar concessions to other Hard Rock Cafe

---

2 "Churning" is a term of art in franchising wherein a franchisor will sell a franchise to a franchisee and thereafter will create a series of facts and circumstance where the franchisee will be left with no alternative but to sell the franchise back to the franchisor at a highly reduced price (thus generating a profit to the franchisor) and wherein the franchisor will then re-sell that franchise to another individual (thus generating additional profit to the franchisor).

franchisees, Dodds, Perez and/or Beacham refused to agree to provide necessary concessions to HRCC and to address the fact that HRCC was losing millions of dollars in food sales.

94.      Instead, Defendants, through the specific participation and assistance of Perez, Dodds and Beacham, have attempted to fabricate reasons to terminate HRCC's franchise agreement with HRL.

95.      Specifically, Dodds, Perez and/or Beacham manufactured false and misleading allegations that HRCC was in breach of its franchise agreement with HRL.

96.      These allegations were clearly designed to create the mistaken impression that HRC Nassau was in default of its obligations under the subject franchise agreement and that as a result, HRCC was subject to having the HRC Nassau franchises terminated by Hard Rock.

97.      Defendants, through the use of false and misleading representations regarding the profitability of the Hard Rock Cafe franchise and food costs, forced HRCC to operate at a loss with the intent of taking over the franchises and depriving HRCC from the benefit of its investment in the franchise.

98.      As a result of Defendants' actions, HRC Nassau incurred significant expenses and losses in the operation of HRC Nassau.

## CAUSES OF ACTION

### COUNT I
### Piercing the Corporate Veil
### (Against Defendant HRL)

99.      Plaintiff incorporates each and every allegation in paragraphs 1 through 98, above, as if fully set forth herein.

100.      Defendant HRL is an affiliated entity of Defendant Hard Rock.

101.      HRL was created for the sole purpose of selling Hard Rock Cafe franchises under

14

the Hard Rock brand.

102.    HRL has no staff in Jersey and conducts no business in Jersey in connection with its franchise relationship with HRCC.

103.    At all relevant times, Hard Rock acted through HRL.

104.    At all relevant times, Defendant Hard Rock, by and through its officers and directors, dominated and controlled the franchise relationship between HRL and HRCC such that HRL had no independent existence from Hard Rock and acted as a mere instrumentality for Hard Rock.

105.    Hard Rock exercised and enforced HRL's rights pursuant to the franchise agreement between HRCC and HRL.

106.    For example, all monthly invoices for continuing fees due under the franchise agreement between HRL and HRCC were sent to HRCC from Hard Rock's headquarters in Orlando, Florida.

107.    Likewise, all payments for continuing fees due under the franchise agreement between HRL and HRCC were sent from HRCC to Hard Rock's headquarters in Orlando, Florida.

108.    In addition, Hard Rock sent termination and default notices to HRCC for alleged violations pursuant to the franchise agreement between HRCC and HRL.

109.    As a direct and proximate result of Defendants HRL and Hard Rock wrongful conduct, HRCC have suffered and continue to suffer economic losses as a direct result of Defendants' wrongful conduct and taking unconscionable advantage of HRCC.

**COUNT II**
**Violation of Florida's Deceptive and Unfair Trade Practices Act**
**(Against Defendants Hard Rock, Dodds, Perez and Beacham)**

110.    Plaintiff incorporates each and every allegation in paragraphs 1 through 98, above,

as if fully set forth herein.

111.    The Florida Deceptive and Unfair Trade Practices Act (FDUTPA) renders unlawful unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of trade or commerce. Fla. Stat. § 501.204.

112.    At all relevant times, Defendants Hard Rock, Dodds, Perez and Beacham advertised, solicited, provided, offered, and/or distributed goods and services to HRCC, and thereby were engaged in "trade or commerce" as defined by § 501.203(8).

113.    At all relevant times, HRCC was a "consumer" as defined by §501.203(7).

114.    Defendants Hard Rock, Dodds, Perez and Beacham's practices and acts are deceptive and unfair, as follows:

(a)    Refused to provide concessions to address HRCC's safety concerns in HRC Nassau while providing such concessions to other Hard Rock Cafe franchisees;

(b)    Refused to provide concessions to address HRCC's significant financial losses while providing such concessions to other Hard Rock Cafe franchisees;

(c)    Misrepresented that HRCC's losses were not attributable to high food costs, expenses and other operational issues;

(d)    Failed to disclose that the Hard Rock Cafe franchises and Hard Rock's company owned stores were experiencing substantial losses in food sales;

(e)    Forced HRCC to implement programs that imposed additional fees and increased the overall expenses incurred by HRCC;

(f)    Fabricated reasons to justify termination of the franchise agreement with HRCC;

(g)    Wrongfully terminated the franchise agreement with HRCC; and

16

(h)     Prevented HRCC from realizing returns on its investments that could have easily been achieved with minimal support or guidance from Hard Rock and its officers.

115.   Defendants Hard Rock, Dodds, Perez and Beacham were direct participants in the above improper dealings.

116.   As a direct, proximate, and foreseeable result of Defendants Hard Rock, Dodds, Perez and Beacham's deceptive and unfair acts and practices, HRCC have suffered, and will continue to suffer, damages.

**COUNT III**
**Civil Conspiracy**
**(Against Defendants Hard Rock, Dodds, Perez and Beacham)**

117.   Plaintiff incorporates each and every allegation in paragraphs 1 through 98, above, as if fully set forth herein.

118.   Defendants Hard Rock, Dodds, Perez and Beacham reached an agreement or understanding and/or otherwise conspired with one another to drive HRCC out of business in an effort to wrongfully seize the franchises and re-sell such franchises to a third party at a profit.

119.   The acts of Defendants Hard Rock, Dodds, Perez and Beacham, and each of them, were in furtherance of an unlawful conspiracy with a common design and illegal purpose to violate a legal duty for their own personal financial gain and which was carried out through unlawful means.

120.   In furtherance of the conspiracy, Defendants Hard Rock, Dodds, Perez and/or Beacham executed the following overt acts:

(a)     Refused to provide concessions to address HRCC's safety concerns in HRC Nassau while providing such concessions to other Hard Rock Cafe franchisees;

(b)     Refused to provide concessions to address HRCC's significant financial

ZARCO EINHORN SALKOWSKI & BRITO
MIAMI TOWER, 100 S.E. 2ND STREET, 27TH FLOOR, MIAMI, FLORIDA 33131 (305) 374-5418 FAX (305) 374-5428

losses while providing such concessions to other Hard Rock Cafe franchisees;

       (c)    Misrepresented that HRCC's losses were not attributable to high food costs, expenses and other operational issues;

       (d)    Failed to disclose that the Hard Rock Cafe franchises and Hard Rock's company owned stores were experiencing substantial losses in food sales;

       (e)    Forced HRCC to implement programs that imposed additional fees and increased the overall expenses incurred by HRCC;

       (f)    Fabricated reasons to justify termination of the franchise agreement with HRCC;

       (g)    Wrongfully terminated the franchise agreement with HRCC; and

       (h)    Prevented HRCC from realizing returns on its investments that could have easily been achieved with minimal support or guidance from Hard Rock and its officers.

121.    Defendants owed a duty to HRCC to act in good faith and protect HRCC from such unlawful acts.

122.    As a direct, proximate and foreseeable result of Defendants' wrongful acts, HRCC have suffered and continue to suffer substantial damages.

**COUNT IV**
**<u>Constructive Termination</u>**
**(Against Defendant Hard Rock)**

123.    Plaintiff incorporates each and every allegation in paragraphs 1 through 98, above, as if fully set forth herein.

124.    Defendant Hard Rock, through the use of false and misleading representations, caused HRCC to incur significant losses by refusing to provide concessions to HRCC and fabricating reasons to justify termination of the applicable franchise agreement.

18

ZARCO EINHORN SALKOWSKI & BRITO
MIAMI TOWER, 100 S.E. 2ND STREET, 27TH FLOOR, MIAMI, FLORIDA 33131 (305) 374-5418 FAX (305) 374-5428

125.    As a result of Defendant Hard Rock's wrongful conduct, HRCC was deprived of the benefit of its investment and was forced to operate at a loss on food sales, thereby preventing HRCC from effectively operating the franchises.

126.    HRCC have suffered and continue to suffer economic losses as a direct result of Defendants' wrongful conduct.

## PRAYER FOR RELIEF

Plaintiff HRCC, LTD., respectfully requests that this Honorable Court enter a judgment in its favor and against Defendants, HARD ROCK CAFE INTERNATIONAL (USA), INC., HARD ROCK LIMITED, TOM PEREZ, HAMISH DODDS and MICHAEL BEACHAM, for:

(i)      rescission of the agreement with HRL and its affiliates; and/or

(ii)     recovery of all monies tendered by HRCC in connection with the opening and operating of its Hard Rock Cafe restaurant franchises;

(iii)    actual and compensatory damages and lost profits in favor of HRCC and against Defendants in amounts to be proven at trial on each of the claims set forth herein;

(iv)     attorneys' fees, costs and pre-judgment and post-judgment interest; and

(v)      such other and further relief as this Honorable Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff HRCC, LTD. hereby respectfully requests a trial by jury on all issues so triable.

Dated: December 1, 2014              Respectfully submitted,

ZARCO EINHORN SALKOWSKI & BRITO, P.A.
*Counsel for Plaintiff*
Miami Tower
100 S.E. 2nd Street
27th Floor
Miami, FL 33131
Telephone No. (305) 374-5418
Facsimile No. (305) 374-5428

By:____/s/ Alejandro Brito_____
    **ROBERT ZARCO** (FBN 502138)
    **ALEJANDRO BRITO** (FBN 098442)
    **ALEXANDRA BLANCO** (FBN 106874)